IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL DEFENSE
CENTER, a non-profit corporation, and FRIENDS
OF THE TUALATIN RIVER NATIONAL
WILDLIFE REFUGE, a non-profit corporation,

                      Plaintiffs,

     v.

GRABHORN, INC., an Oregon corporation,

                      Defendant.

CV-08-548-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

       Plaintiff Northwest Environmental Defense Center ("NEDC") is a non-profit

environmental organization dedicated to protecting water quality throughout Oregon.  Plaintiff

Friends of the Tualatin River National Wildlife Refuge ("Friends") is a nonprofit organization

dedicated to restoring and protecting the Tualatin River and the Tualatin River National Wildlife

Refuge.  On May 7, 2008, plaintiffs filed this action against defendant Grabhorn, Inc.

("Grabhorn").

Grabhorn is an Oregon domestic business partnership whose president and secretary is Howard Grabhorn. Grabhorn owns and operates Lakeside Reclamation Landfill ("Lakeside") in Beaverton, Oregon. Lakeside is a solid waste disposal facility permitted to take, among other items, construction and demolition type wastes. The landfill and compost pile share a contiguous parcel of property with a tree farm, the Grabhorn residence, industrial and agricultural buildings, and four interconnected pond cells ("Grabhorn Pond"). An unnamed creek flows along the facility's eastern property line. A diversion dam in the creek fills Grabhorn Pond.

In this citizen suit, plaintiffs allege that Grabhorn has violated both the Federal Water Pollution Control Act, more commonly known as the Clean Water Act ("CWA"), 33 USC §§ 1251-1387, and the Resource Conservation and Recovery Act ("RCRA"), 42 USC §§ 6901-7000. With regard to the CWA, plaintiffs assert that Grabhorn is violating 33 USC § 1311(a) by discharging pollutants into Grabhorn Pond, an unnamed tributary of the Tualatin River (the unnamed creek running alongside the eastern border of the Grabhorn facility), and the Tualatin River without a required National Pollution Discharge Elimination System ("NPDES") permit. Based on that assertion, plaintiffs bring two alternative claims for violation of the CWA. Although not entirely clear in the pleadings, plaintiffs have since clarified that their First Claim alleges that Grabhorn has discharged and is discharging pollutants from three point sources into Grabhorn Pond, a body of water which plaintiffs contend is a "water of the United States" under the CWA. Alternatively, plaintiffs' Second Claim alleges that Grabhorn Pond itself is a "point source" from which Grabhorn has and is discharging pollutants into waters of the United States, namely into the unnamed creek and the Tualatin River.

Plaintiffs also allege two claims for violation of the RCRA, because Grabhorn has:

(1) engaged in "open dumping of solid waste" in violation of 42 USC § 6945(a) (Third Claim);

and (2) handled, treated, stored, or disposed of solid waste in a manner which "may present an

imminent and substantial endangerment to health or the environment" in violation of 42 USC

§ 6972(a)(1)(B) (Fourth Claim).

This court has jurisdiction over this action under 28 USC § 1331 (federal question

jurisdiction), 33 USC § 1365(a) (CWA jurisdiction), and 42 USC § 6972(a) (RCRA jurisdiction).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this

case in accordance with FRCP 73 and 28 USC § 636(c).

The parties have filed cross-motions for summary judgment concerning the two CWA

claims.  Plaintiffs seek summary judgment that they have standing to bring their claims and that

their claims are not moot because neither the State of Oregon Department of Environmental

Quality ("DEQ") nor the Environmental Protection Agency ("EPA") has commenced any

enforcement action against Grabhorn.  Additionally, plaintiffs seek summary judgment as to

liability on their First Claim on the basis that Grabhorn Pond constitutes "waters of the United

States" as that term is used in the CWA, 33 USC § 1362(7).  With respect to this contention,

plaintiffs assert that Grabhorn Pond satisfies this jurisdictional requirement either as an

"intrastate lake" under 33 CFR § 328.3(a)(3) and 40 CFR § 122.2(c)[1] or as an "impoundment of

---

[1] Both the Army Corps of Engineers ("Corps") and the EPA have regulatory roles in enforcing the CWA and have issued substantively identical regulations defining the term "waters of the United States," which are found at 33 CFR § 328.3 (Corps) and 40 CFR § 122.2 (EPA).  This case involves the applicability of EPA's NPDES permit program.

waters otherwise defined as waters of the United States" under 33 CFR § 328.3(a)(4) and 40 CFR § 122.2(d).[2]

In response, Grabhorn seeks summary judgment against both of the CWA claims. Grabhorn contends that plaintiffs' claims for declaratory and injunctive relief regarding two point source discharges[3] into Grabhorn Pond are moot due to initiation and settlement of enforcement actions by DEQ, followed by Grabhorn's completion of a Work Plan which eliminated discharges into Grabhorn Pond from those two point sources. Grabhorn also asserts that the First Claim fails because Grabhorn Pond is not "waters of the United States." Additionally, Grabhorn asserts that the Second Claim fails because there is no evidence that any discharge from Grabhorn Pond contained pollutants. Alternatively, Grabhorn contends that discharges to groundwater do not require an NPDES permit and there is no evidence of any overflows from Grabhorn Pond to the unnamed creek or the Tualatin River.

A thorough review of the record reveals that standing and mootness are not impediments to the two CWA claims, but that certain portions of those claims are barred either due to the applicable statute of limitations or the jurisdictional requirement of 33 USC § 1365(a)(1) that a CWA violation must be ongoing at the time the claim is filed. Plaintiffs' Motion for Summary Judgment on Affirmative Defenses and Clean Water Act Violations (docket #34) is denied as moot with respect to the standing issue and denied on the merits with respect to whether Grabhorn Pond constitutes "waters of the United States" as either an intrastate lake under

---

[2] Although plaintiffs also contend that Grabhorn Pond constitutes "waters of the United States" as a "wetland" under 33 CFR § 328.3(a)(7) and 40 CFR § 122.2(g), as discussed below, that contention must be reserved for later proceedings.

[3] As explained below, these two point sources are identified by the parties as "Outfalls 1 and 2," which were located near the northern end of Grabhorn Pond.

33 CFR § 328.3(a)(3) and 40 CFR § 122.2(c) or an "impoundment" under 33 CFR § 328.3(a)(4) and 40 CFR § 122.2(d). Defendant's Cross-Motion for Summary Judgment (docket #49) is granted as to: (1) the First Claim, except to the extent it is premised on Grabhorn Pond being a wetland adjacent to other waters of the United States and (a) seeks civil penalties premised upon discharges between March 8, 2003, and September 25, 2009, into Grabhorn Pond through Outfalls 1 and 2; or (b) seeks civil penalties or other relief premised upon alleged discharges on or after March 8, 2003 into Grabhorn Pond through "rivulets" (Amended Complaint, ¶ 48), an "area of ponding" (Plaintiffs' Opening Brief (docket #42), pp. 6, 17, 19-20), with a direct hydrological connection; and (2) the Second Claim, except to the extent it is premised upon alleged pollution on or after March 8, 2003, through groundwater with a direct hydrological connection to navigable waters.

## SUMMARY JUDGMENT STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986); *Fairbank v. Wunderman Cato Johnson*, 212 F3d 528, 531 (9th Cir 2000). Once the moving party does so, the nonmoving party must "set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Horphag Research Ltd. v. Garcia*, 475 F3d 1029, 1035 (9th Cir 2007) (internal quotation marks and citations omitted). The court must "not weigh the evidence or determine the truth of the matter," but must instead "only determine whether there is a genuine issue for trial." *Evanston Ins. Co. v. OEA, Inc.*, 566

F3d 915, 919 (9th Cir 2009), citing *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted). The court must "view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F3d 781, 784 (9th Cir 2007), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## ANALYSIS

### I. Legal Framework for the CWA Claims

#### A. CWA Prohibitions

The CWA provides that "the discharge of any pollutant . . . shall be unlawful" unless, in pertinent part, the discharge is made pursuant to and is authorized by an NPDES permit, as provided by Section 402 of the CWA, 33 USC § 1342. 33 USC § 1311(a). "Discharge of a pollutant" means any "addition of any pollutant to navigable waters from any point source." 33 USC § 1362(12). A pollutant includes "industrial, municipal, and agricultural waste discharged into water." 33 USC § 1362(6). A point source is "any discernable, confined and discrete conveyance," and navigable waters are broadly defined as "the waters of the United States." 33 USC §§ 1362(7) & (14).

///

**B.  NPDES Permit**

The NPDES permitting scheme is the primary means by which discharges of pollutants are controlled.  NPDES permits must include conditions that will ensure compliance with the CWA.  At a minimum, NPDES permits must include technology-based effluent limitations, any more stringent limitations necessary to meet water-quality standards, and monitoring and reporting requirements. *See* 33 USC §§ 1311, 1318, 1342.

The EPA is the primary administrator of the CWA.  However, the CWA authorizes the EPA to delegate its authority to states to implement and administer the CWA.  33 USC § 1342(b).  Pursuant to this provision, the DEQ has authority to regulate discharges of pollutants by, among other actions, issuing NPDES permits to dischargers.  *See* OAR Chapter 340, Division 045.  Compliance with an NPDES permit is deemed compliance with the general discharge prohibition in § 301(a).  33 USC § 1342(k).

**C.  Individual NPDES Permits and 1200-Z NPDES General Storm Water Permit**

The CWA requires the EPA, and accordingly the DEQ, to regulate discharges of pollutants through storm water associated with industrial activities.  33 USC § 1342(p)(3)(A).  The CWA allows permit-issuing agencies to regulate dischargers that engage in substantially similar practices and discharge substantially the same pollutants through general NPDES permits.  A facility that qualifies for coverage under a general NPDES permit need not apply for an individual NPDES permit.

///

///

///

The DEQ typically regulates discharges of storm water associated with industrial activities through general NPDES permits.  The DEQ regulates industrial storm water discharges in most Oregon watersheds, including the Tualatin watershed, through the 1200-Z NPDES Permit, which it recently reissued in 2007.

The 1200-Z NPDES Permit covers only discharges of storm water.  Federal regulations define storm water as "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 CFR § 122.26(b)(13).  The DEQ further defines storm water as "water from precipitation or snow melt that collects on or runs off outdoor surfaces such as buildings, roads, paved surfaces and unpaved land surfaces."  OAR 340-044-0005(41).

Although "[l]andfills, land application sites and open dumps" can be covered under the 1200-Z NPDES Permit, the general permit is explicitly unavailable to landfills that discharge "contaminated storm water," as defined by 40 CFR § 445.2, to waters of the United States. 1200-Z Permit, Table 1.  Federal regulations define "contaminated storm water" as "storm water which comes in direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater."  40 CFR § 445.2(b).

Additionally, the 1200-Z NPDES Permit cannot cover discharges of "process wastewater."  Federal regulations define "process wastewater" as "any water which, during manufacturing or processing, comes into direct contact with or results from the use of any raw material, intermediate product, finished product, byproduct or waste product."  40 CFR § 122.2. The EPA has explicitly defined "landfill wastewater" as a type of "process wastewater." "Landfill wastewater" is "all wastewater associated with, or produced by, landfilling activities except for sanitary wastewater, non-contaminated storm water, contaminated ground water, and

wastewater from recovery pumping wells." 40 CFR § 445.2(f). Facilities that discharge

contaminated storm water or process wastewater must obtain an individual NPDES Permit, as

the 1200-Z General Permit is, by its own terms, not applicable to such facilities.

### D. Citizen Enforcement

CWA enforcement actions may be initiated by the EPA, states, and citizens. 33

USC §§ 1319, 1365(a). Citizens are required to provide 60 days notice of any alleged violations

prior to commencing suit. 33 USC § 1365(b). After 60 days have passed, citizens may bring an

action in federal district court to enforce against any ongoing violations of the CWA.

Section 505, 33 USC § 1365(a), authorizes citizens to bring suit against any person,

including a corporation, who is alleged to be in violation of an effluent standard or limitation

under the CWA. Effluent limitation is defined broadly to include "any unlawful act under

subsection (a) of [section 301] of this title." 33 USC § 1365(f).

Section 309, 33 USC § 1319(d), adjusted by 40 CFR § 19.4, provides for civil penalties

of up to $32,500.00 per day per violation. Violations occurring before March 15, 2004, carry

penalties of up to $27,500.00 per day.

## II. Undisputed Material Facts

### A. Grabhorn's Landfill and Composting Facility

Grabhorn owns and operates Lakeside, a construction and demolition dry waste landfill in

Beaverton, Oregon. The landfill has operated since 1957 and operates under a solid waste

disposal permit issued by DEQ. DEQ has never required a leachate collection system for the

landfill, and the landfill has no such system. Vehicles drive on and around the landfill and then

onto Vandermost Road. Mensher Decl., Ex. N, p. 5. Grabhorn also operates a composting

facility at the same location.  The composting facility is operated pursuant to a solid waste

disposal: composting facility permit also issued by DEQ.

**B.  <u>Grabhorn Pond</u>**

Grabhorn's landfill and composting facility are operated at a site near the banks of the

Tualatin River.  A manmade irrigation pond, Grabhorn Pond,[4] consisting of a series of four

interconnected pond cells, is also located on the Grabhorn property.  Grabhorn Decl., Ex. 4;

Mensher Decl., Exs. A & C.  Howard Grabhorn and his father created Grabhorn Pond in stages

between the 1950's and the 1970's.

Grabhorn Pond is a surface water storage reservoir subject to water rights certificates

issued by the Oregon Water Resources Department.  Grabhorn Decl., ¶ 4.  Water from Grabhorn

Pond is used for the irrigation of crops and Christmas trees on the portion of the Grabhorn

property north of the landfill and composting facilities.  *Id*.  Grabhorn Pond is completely fenced

off and the public has no right of access to or right to use Grabhorn Pond.  *Id*.  Grabhorn Pond is

stocked with catfish and supports a small population of birds.  Mensher Decl., Ex. J, p. 3.

However, fish are not taken from the pond and sold.  Grabhorn Decl., ¶ 4.

The southernmost edge of Grabhorn Pond is a few hundred feet from the northern bank of

the Tualatin River.  *Id*, Ex. 4.  An unnamed creek runs along the eastern boundary of the

Grabhorn property and flows into the Tualatin River.  *Id*, ¶ 6.  It is undisputed that the Tualatin

River and the unnamed creek are waters of the United States.  Defendant's Answer to Plaintiffs'

Amended Complaint, ¶ 15.

---

[4]  The parties dispute whether the four pond cells are properly called "Grabhorn Lake" or "Lake Grabhorn."  *Compare* Defendant's Opposition to Plaintiffs' Concise Statement of Material Facts and Supplemental Statement of Concise Facts (docket #48), ¶ 8 *with* Mensher Decl., Ex. K.  For purposes of these motions, this court will refer to the four pond cells collectively as "Grabhorn Pond."

Grabhorn Pond is separated from the unnamed creek and the Tualatin River by an area of high, dry land.  Malin Decl., ¶¶ 7-9.  This land is constantly above the highest levels of Grabhorn Pond, the unnamed creek, and the Tualatin River, and is not subject to seasonal flooding, except along the low-lying shore of the Tualatin River.  It supports grasses, trees and other typical dry land flora and fauna.  *Id*, ¶¶ 7-9; Malin Depo., pp. 17, 48.  Grabhorn Pond has never overflowed.  Grabhorn Depo., p. 21.

### C.  Pipes Between Grabhorn Pond and the Unnamed Creek

Two pipes were installed between Grabhorn Pond and the unnamed creek, one of which diverts water into Grabhorn Pond from the unnamed creek.[5]  Neither of those pipes currently allows water to flow or backflow from Grabhorn Pond into the unnamed creek.  The historical information concerning the nature of the hydrological connection created by these pipes, however, is critical to the present motions.

The southernmost pipe, located approximately midway along the eastern boundary of the southeasternmost cell of Grabhorn Pond (Grabhorn Decl., Ex. 4, labeled "decommissioned pipe") had a valve which kept water from flowing into the unnamed creek.  Although the valve could be opened to allow water to flow from Grabhorn Pond into the unnamed creek, Grabhorn never discharged water into the unnamed creek through this pipe.  *Id*, ¶ 10.  However, on one occasion in 2000, unrelated and unauthorized third parties opened the valve, allowing some

---

[5]  In addition to the water entering Grabhorn Pond from the unnamed creek, plaintiffs contend that contaminated storm water entered and/or enters Grabhorn Pond from several "outfalls," "rivulets," and an "area of ponding" near the north end and northwest berm of Grabhorn Pond.  Grabhorn denies that the storm water entering Grabhorn Pond from discharge points contains pollutants and contends that any metals and chemicals in the storm water are from natural sources.  These issues may become relevant in the event that plaintiffs establish that Grabhorn Pond is "waters of the United States," thereby meeting the jurisdictional requirements of the CWA.  However, at least for purposes of the present motions, these disputes need not be resolved.  As discussed below, this court concludes that Grabhorn Pond is not "waters of the United States" as either an intrastate lake or as an impoundment.

discharge of water from Grabhorn Pond into the unnamed creek. Upon discovering the

vandalism, Grabhorn decommissioned the pipe by filling it with dirt so it could not be used

again. *Id*, ¶ 10 & Ex. 6; Howard Grabhorn Depo., pp. 31-32.

Another pipe is situated between the unnamed creek and the eastern boundary of the

northeasternmost of the three pond cells along the eastern edge of Grabhorn Pond (Grabhorn

Decl., Ex. 4, labeled "18" pipe"). Through that pipe, water from the unnamed creek flows into

Grabhorn Pond by the force of gravity. A dam on the creek has a gate which can be raised and

lowered in order to create an impoundment in the creek. The pipe is immediately upstream of

the dam. When water impounded in the unnamed creek rises high enough, it flows through the

pipe into the northeasternmost pond cell of Grabhorn Pond.

As discussed in more detail below, the parties dispute whether water from Grabhorn Pond

has ever backflowed into the unnamed creek through this pipe. Howard Grabhorn denies any

knowledge of any such backflow. However, on February 25, 2008, in response to DEQ concerns

of theoretically possible backflow, Grabhorn installed an anti-backflow device, known as a

"gator flap," in that pipe. *Id*, ¶ 9. This makes it impossible for water to flow from Grabhorn

Pond through the pipe into the unnamed creek. *Id*, ¶ 9 and Ex. 5; Grabhorn Depo., p. 44; Malin

Depo., pp. 11-13; Scholz Depo., pp. 8-9. As a result, neither of the two pipes between Grabhorn

Pond and the unnamed creek allow water to flow out of Grabhorn Pond into the unnamed creek.

### D. **Administrative Proceedings Between DEQ and Grabhorn**

From the early 1990's until early 2000, Grabhorn had an NPDES 1200-Z permit.

However, on March 16, 2000, DEQ cancelled that permit after determining that there were no

discharge points where storm water could be sampled because all runoff either infiltrated into the soil or is sheet flow inside the landfill itself. Grabhorn Decl., ¶ 11 & Ex. 7.

From 2000 until early 2008, DEQ did not require or suggest that Grabhorn needed a new NPDES permit. However, on January 8, 2008, DEQ Storm Water Engineer James Nusrala ("Nusrala") and DEQ Solid Waste Inspector Stephani Rawson ("Rawson") visited the Grabhorn site in order to look at the irrigation ponds (Grabhorn Pond) and the site's drainage patterns. Mensher Decl. (docket #35), Ex. I. During that visit, Nusrala and Rawson identified two pipes discharging runoff into Grabhorn Pond. One of those pipes has two discharge points into the northern end of Grabhorn Pond (identified by Rick Malin as "Outfall 1" and "Outfall 2"), and one pipe near the northwestern berm of Grabhorn Pond (identified as "Outfall 3").[6] Mensher Decl., Ex. I, p. 2; Malin Decl., ¶ 4 & Ex. 13. In addition, the letter states: "At the northwest corner, we observed runoff draining along the road and pathway down the slope into the ponds."[7] Mensher Decl., Ex. I, p. 2.

A week later, on January 15, 2008, Nusrala sent Grabhorn a Warning Letter with Opportunity to Correct ("Warning Letter"). Grabhorn Decl., Ex. 8 (Mensher Decl., Ex. V). In the Warning Letter, Nusrala asserted that: "The water in the ponds is connected to the unnamed creek along the eastern edge of the ponds through a diversion structure which in turn flows into the Tualatin River to the south. * * * [T]here is exposure of the composting and landfill

---

[6] Outfall 3 apparently also had two discharge points into Grabhorn Pond. Grabhorn Decl., Ex 5, p. 5. For ease of reference, this court will refer to that pipe and its two associated discharge points as the "Outfall 3 pipe."

[7] In their subsequent letter to Grabhorn and in their pleadings, plaintiffs refer to "rivulets" of contaminated groundwater flowing either directly into Grabhorn Pond – or discharging into Grabhorn Pond through the soil – as point source(s) of pollutants reaching Grabhorn Pond. Riskedahl Decl., Ex. U, p. 2; Complaint, ¶ 34; Amended Complaint, ¶ 48. This includes an "area of stormwater ponding" or "area of ponding" allegedly created by the removal of the Outfall 3 pipe in February 2008. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment on Affirmative Defenses and Clean Water Act Violations (docket #42), pp. 6, 17, 19-20.

13 - OPINION AND ORDER

activities to stormwater, and there is a discharge of stormwater runoff from the activities to surface waters of the state, the Tualatin River." *Id*, p. 1.  The Warning letter alleged Class I (the most serious) violations of ORS 468.B.050 and ordered Grabhorn to take corrective actions, including ceasing the discharge of stormwater from the composting and landfill areas into the ponds or delivering to the DEQ a NPDES 1200-Z Permit application, a Land Use Compatibility Statement, and a Storm Water Pollution Control Plan ("SWPCW") by February 15, 2008.  *Id*, p. 2.  The Warning Letter specified that "the SWPCW needs to identify the source of all stormwater discharges to the ponds . . . including the discharge located on the western berm of the ponds," which appears to be a reference to the Outfall 3 pipe.  *Id*.

In a letter dated January 24, 2008, NEDC and Friends sent a "Sixty-day Notice of Violations of the Clean Water Act" to Grabhorn, citing the DEQ inspection of January 8, 2008, stating that Grabhorn is violating the CWA by discharging pollutants to ponds on his property without an NPDES permit, and addressing their intent to file suit seeking penalties and injunctive relief.  Riskedahl Decl., Ex. U.

On February 13, 2008, Grabhorn responded to the DEQ denying any violation.  Grabhorn Decl., Ex 5.  Grabhorn indicated that Lakeside had removed the Outfall 3 pipe (and its two points of discharge into Grabhorn Pond) and had "enhanced the lower access road north of where the former drainage pipe was located to prevent surface drainage to [Grabhorn Pond] from this area." *Id*, p. 2.  In addition, Grabhorn denied any "ongoing discharge from the ponds to the creek or the Tualatin River."  *Id*.  Instead, Grabhorn asserted that the pipe from the upstream side of the creek diversion structure into the eastern area of the irrigation ponds (pipe connecting the unnamed creek to the northeastern pond cell of Grabhorn Pond) is "constructed for water to flow only one

way – and that is <u>into</u>, not out of, the ponds." *Id*, p. 1 (emphasis in original).  In particular, Grabhorn noted that the "system was not intended to discharge into the creek" and that he was "not aware that it has ever done so." *Id*.  Nevertheless, he recognized that "theoretically" there might be "a possible risk of back flow to the creek from the irrigation water in the ponds" if the "water level in the creek dropped sufficiently, and the water level in the ponds remained high." *Id*.  In order to foreclose that "theoretical risk," Grabhorn agreed to install an anti-backflow device ("gator flap") into the remaining pipe between Grabhorn Pond and the creek.  *Id*, pp. 1-2.

Grabhorn installed the anti-backflow device on February 25, 2008.  *Id*, ¶ 9.  A month later, on March 19, 2008, DEQ issued a Pre-Enforcement Notice.  *Id*, Ex. 9.  The Pre-Enforcement Notice reiterated DEQ's allegations of violations, requested corrective action, and stated that the matter would be referred to DEQ's enforcement division.  *Id*.

**E.  Citizen Suit and Settlement Between Grabhorn and DEQ**

On May 7, 2008, two months after DEQ issued its Pre-Enforcement Notice, plaintiffs filed this action, alleging the CWA violations currently at issue and, in particular, that Grabhorn is discharging pollutants through "contaminated storm water" and "process wastewater" into an on-site "impoundment."  About six weeks later, on July 21, 2008, DEQ issued a Notice of Violation, Department Order and Civil Penalty Assessment ("Notice and Order"), assessing a civil penalty of $8,800.00 for discharging wastes into waters of the state from an industrial or commercial establishment without a permit, and ordering Grabhorn to immediately cease its stormwater discharges.  *Id*, Ex. 10.

On August 8, 2008, Grabhorn filed an Answer, disputing the violations and requesting a contested case hearing.  *Id*, Ex. 12.  Over the next nine months, DEQ and Grabhorn negotiated a

settlement of the alleged violations.  During the course of those negotiations, Grabhorn's

consultants prepared a *Draft Stormwater Discharge Elimination Work Plan for the Lakeside*

*Reclamation Landfill* ("Work Plan"), which was approved by the DEQ on December 8, 2008.

Second Riskedahl Decl., Ex. Y.  Subsequently, on May 6, 2009, DEQ and Grabhorn entered into

a "Mutual Agreement and Order" ("MAO") resolving the violations in the Notice and Order.

Grabhorn Decl., Ex. 12.

In the MAO, the civil penalty for "Violation No. 1" was reduced from $8,800.00 to

$5,600.00 and 80% of that penalty was mitigated on condition that Grabhorn satisfactorily

complete a Supplemental Environmental Project ("SEP") by May 22, 2009.  *Id*, Ex. 12, ¶¶ 8-9 &

Ex. B.  Grabhorn paid a fine of $ 1,120.00 and an SEP payment of $4,480.00.  The MAO also

required Grabhorn to comply with and implement the Work Plan and to implement and maintain

Best Management Practices to reduce the discharge of pollutants in storm water for the 2008-09

wet season.  *Id*, Ex. 12, ¶ 14.  DEQ and Grabhorn agreed that "[Grabhorn's] compliance with [the

MAO] shall obviate any need for [Grabhorn] to have had or to obtain an NPDES permit for

circumstances alleged in the Notice of Violation."  *Id*, Ex. 12, ¶ 15.

### F.  Post-Filing On-Site Activities

On December 12, 2008, this court granted the parties' request to bifurcate this case into a

civil liability phase and a remedy phase.  Order Granting Stipulated Motion to Bifurcate (docket

#29).  Subsequent to the filing of and oral argument on the pending summary judgment motions,

the parties filed additional briefing concerning on-site activities.  According to the supplemental

materials in support of those briefs, on September 25, 2009, Grabhorn completed construction of a

new detention pond consistent with the criteria established in the Work Plan.  Declaration of Rick

Malin in Support of Defendant's Supplemental Brief to the Court (docket #93), ¶ 7.  As a result, the storm water that had been conveyed to Grabhorn Pond through Outfalls 1 and 2 on the north side of Grabhorn Pond is now conveyed to the new stormwater detention pond.  *Id*, ¶ 8.

## III.  Preliminary Issues

### A.  Standing

In their motion, plaintiffs sought summary judgment that they have standing to bring their claims.  In response, Grabhorn did not challenge plaintiffs' standing, at least for purposes of the summary judgment motions.  More recently, in its Answer to Plaintiff's Amended Complaint (docket #86), filed after oral argument on the pending motions for summary judgment, Grabhorn removed standing as an affirmative defense, thus mooting this issue.  Accordingly, to the degree plaintiffs' motion seeks summary judgment on the issue of standing, the motion is denied as moot since plaintiffs' standing is no longer contested by Grabhorn.

### B.  Discharges Through Hydrologically Connected Groundwater

Another issue that permeates the pending motions is whether the CWA covers discharges to waters of the United States through hydrologically connected groundwater.  Because resolution of this issue affects the remaining issues, this court addresses it first.

The two CWA claims assert that Grabhorn has discharged and continues to discharge pollutants into waters of the United States without an NPDES permit.  The First Claim alleges that Grabhorn Pond is itself "waters of the United States," into which Grabhorn is discharging pollutants from three point sources in violation of the CWA.  Alternatively, the Second Claim alleges that Grabhorn Pond itself is a "point source" of pollution discharging into the unnamed creek and the Tualatin River through groundwater.

Despite their concession that the only two surface water sources (*i.e.*, the two pipes that are now either decommissioned or equipped with an anti-backflow device) ceased discharging from Grabhorn Pond into the creek no later than February 2008, plaintiffs assert that Grabhorn Pond continues to discharge pollutants into navigable waters (the unnamed creek and the Tualatin River) through hydrologically connected groundwater.[8]

Grabhorn argues that any claim based on hydrologically connected groundwater fails because the CWA does not regulate hydrologically connected groundwater, citing *Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.*, 962 F Supp 1312 (D Or 1997).  In *Umatilla*, Judge Robert E. Jones observed that the "CWA's NPDES program *should* apply to groundwater to adequately protect surface water," but nevertheless concluded that "the law as written, as intended by Congress, and as applied in Oregon for over two decades does not regulate even hydrologically-connected groundwater."  *Id* at 1318 (emphasis in original).  That conclusion is supported by a well-reasoned opinion extensively analyzing the legislative history of the CWA, as well as both the decades-long interpretations by EPA and DEQ.  Plaintiffs attempt to distinguish *Umatilla* on the basis that the court did not address whether a discharge *through* groundwater directly into a water of the United States fell within the CWA.  However, Judge Jones expressly held that "discharges of pollutants into groundwater are not subject to the the CWA's NPDES permit requirement *even if that groundwater is hydrologically connected to surface water*."  *Id* at 1320 (emphasis added).

///

---

[8] This same issue crops up in plaintiffs' First Claim because the third alleged point source of discharge into Grabhorn Pond is an area where a pipe was removed in February 2008 that allegedly now has created an "area of ponding" which discharges into Grabhorn Pond through groundwater.

*Umatilla* distinguished the cases relied on by plaintiffs for failing to adequately address the relevant interpretive history.  *Id* at 1319 ("Courts interpreting the CWA's NPDES permit program as applying to hydrologically-connected groundwater have uniformly failed to address this interpretive history.") (citations omitted).  Nevertheless, its holding hinged in no small measure on the EPA's failure to offer any "formal or consistent interpretation of the CWA that would subject discharges to groundwater to the NPDES permitting requirement."  *Id*.  Judge Jones noted that, had EPA done so, its interpretation would be entitled to "great deference" under *Chevron U.S.A., Inc. v. Natural Resources Defense Council* 467 US 837 (1984), and its progeny:  "Of course, if EPA in the future formally interprets the CWA so as to bring hydrologically-connected groundwater explicitly within the ambit of NPDES permitting, this court will accord that formal interpretation normal *Chevron* deference."  *Id* at 1319 n2.

More recent cases have found CWA jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States.  However, they have done so by concluding – largely without analysis – that the "interpretive history of the CWA only supports the unremarkable proposition with which all courts agree – that the CWA does not regulate 'isolated/nontributary groundwater' which has no affect on surface water" and "does not suggest that Congress intended to exclude from regulation discharges into hydrologically connected groundwater which adversely affects surface water."  *Idaho Rural Council v. Bosma*, 143 F Supp2d 1169, 1180 (D Idaho 2001), quoting *Washington Wilderness Coalition v. Hecla Mining Co.*, 870 F Supp 983, 990 (ED Wash 1994); *see also Hernandez v. Esso Standard Oil Co.*, 599 F Supp2d 175, 181 (D PR 2009) ("the decision not to comprehensively regulate groundwater as part of the CWA does not require the conclusion that Congress intended to exempt

groundwater from all regulation, particularly when the introduction of pollutants into the

groundwater adversely affects adjoining river surface water"). This conclusory finding sidesteps

the interpretive history discussed in *Umatilla*. As noted in *Umatilla*, Congress explicitly excluded

"groundwater" from the definition of "discharge of a pollutant," while including the three other

categories of waters (navigable waters, the contiguous zone, and the ocean) discussed in the

CWA. *Umatilla*, 962 F Supp at 1318, citing 33 USC § 1362(12).

Nevertheless, both before and after the decision in *Umatilla*, EPA has made clear that it

believes that discharges to groundwater with a direct hydrologic connection to navigable surface

waters is subject to regulation under the CWA. In 1992, in a final rule amending the water quality

standards applicable on Indian reservations, the EPA noted:

> Notwithstanding the strong language in the legislative history of the
> Clean Water Act to the effect that the Act does not grant EPA
> authority to regulate pollution of groundwaters, EPA and most
> courts addressing the issues have recognized two limited instances
> where, for the purpose of protecting surface waters and their uses,
> EPA may exercise authorities that may affect underground waters.
> First, the Act requires NPDES permits for discharges to
> groundwater where there is a direct hydrological connection
> between groundwaters and surface waters. In these situations, the
> affected groundwaters are not considered "waters of the United
> States" but discharges to them are regulated because such
> discharges are effectively discharges to the directly connected
> surface waters.

56 FR 64876-01, 64892 (Dec. 12, 1991, effective Jan. 13, 1992).

Moreover, in proposed rulemaking in 2001 relating to concentrated animal feeding

operations, EPA "restat[ed] that [it] interprets the Clean Water Act to apply to discharges of

pollutants from a point source via ground water that has a direct hydrological connection to

surface water." 66 FR 2960, 3015 (Jan. 12, 2001) (proposed rulemaking NPDES Permit

Regulation and Effluent Limitations Guidelines and Standards for Concentrated Animal Feeding Operations). That rule was finalized in 2003, noting approval by the Second Circuit of the EPA's 2003 rules relating to groundwater controls: "The court upheld EPA's decision in the 2003 rule relating to groundwater controls. In the 2003 rule, ERA stated that the Agency believed that requirements limiting the discharge of pollutants to surface water via groundwater that has a direct hydrological connection to surface water should be addressed on a site-specific basis. The Agency also noted that nothing in the 2003 rule was to be construed to expand, diminish, or otherwise affect the jurisdiction of the CWA over discharges to surface water via groundwater that has a direct hydrologic connection to surface water." 73 FR 70418-01, 70420 (Nov. 20, 2008) (final rule, citing *Waterkeeper Alliance v. US EPA*, 399 F3d 486, 514-15 (2nd Cir 2005)).

Based on the proposed rule in 2001, at least one court has concluded that "there is little dispute that if the ground water is hydrologically connected to surface water, it can be subject to [CWA certification]." *Greater Yellowstone Coalition v. Larson*, 2009 WL 2424100 *14 (D Idaho Aug. 4, 2009). In light of the EPA's regulatory pronouncements, this court concludes that, contrary to *Umatilla*, the CWA covers discharges to navigable surface waters via hydrologically connected groundwater. Therefore, Grabhorn's request for summary judgment against the Second Claim on this basis fails. Accordingly, that portion of Grabhorn's cross-motion for summary judgment is denied.

### C.  Requirement of "Ongoing" Violations at Commencement of Suit

Another preliminary issue is whether plaintiffs can allege a claim premised upon discharges from particular point sources that ceased to exist by the time they filed this case. With respect to several discharge points that were effectively eliminated as possible sources of pollutant

discharge before the filing of this case, the question is whether plaintiffs can allege "ongoing" violations.

Citizen suits are permitted "against any person . . . who is alleged to be in violation" of effluent standards or limitations of the CWA or in violation of an order respecting such standards or limitations." 33 USC § 1365(a)(1). Under that provision, "citizens, unlike the EPA, may seek the imposition of civil penalties for violations of the Clean Water Act only in suits brought to enjoin or otherwise abate ongoing violations," meaning that "to invoke federal jurisdiction . . . a citizen plaintiff must allege 'a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'" *Sierra Club v. Union Oil of California*, 853 F2d 667, 669 (9th Cir 1988), quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 US 49, 57 (1987).

As clarified by plaintiffs in the pending motions, the First Claim is premised upon discharges into Grabhorn Pond, which plaintiffs contend is "waters of the United States" for purposes of the CWA. Plaintiffs identify three possible sources of pollutant discharges: (1) a pipe and two associated discharge points that existed at the time the Complaint was filed but were rerouted as of September 25, 2009 to discharge into another lined detention pond (Outfalls 1 and 2); (2) the Outfall 3 pipe and its two discharge points that were removed in February 2008; and (3) groundwater either running in "rivulets" down the northwest berm of Grabhorn Pond (*see* Riskedahl Decl., Ex. U, p. 2; Complaint, ¶ 34; Amended Complaint, ¶ 48) or discharging into Grabhorn Pond through the soil from the "area of ponding" near the previous location of the Outfall 3 pipe (*see* Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary

Judgment on Affirmative Defenses and Clean Water Act Violations (docket #42), pp. 6, 17, 19-20; Complaint, ¶ 34; Amended Complaint, ¶ 48).

Although not explicitly so categorized in the pleadings, plaintiffs' claims can best be analyzed by considering four consecutive time periods. First, there is the time period before March 8, 2003, which is the outside date of the applicable five-years-plus-60-days statute of limitations.[9] Given that Grabhorn decommissioned one of the pipes connecting Grabhorn Pond and the unnamed creek sometime in 2000, whatever claim might have been available related to that discharge point source expired long before plaintiffs filed this action. Second, there is the period between March 8, 2003, and February 2008, when Grabhorn removed the Outfall 3 pipe and installed the anti-backflow device into the pipe between Grabhorn Pond and the unnamed creek. The third relevant time period is between February 2008 and September 25, 2009, when Grabhorn rerouted Outfalls 1 and 2 to the new detention pond. Finally, there is the time period from September 25, 2009, to the present.

Given that Grabhorn removed the Outfall 3 pipe and its two associated discharges points in February 2008, over two months prior to the filing of this case, plaintiffs can claim no "ongoing violation" based upon discharges through those points. Moreover, nothing in the record reveals any basis on which to conclude that there was or is a reasonable likelihood of continuing violations as a result of discharges through those points. Accordingly, this court has no subject matter jurisdiction over the First Claim to the extent it is premised upon discharges through the

---

[9] Plaintiffs filed this lawsuit on May 7, 2008. That date both serves to determine the outside limit of the applicable statute of limitations and as the relevant date to evaluate allegations of ongoing violations. The general federal five-year limitation period applies to citizen actions seeking enforcement of civil penalties under the CWA. *Sierra Club v. Chevron U.S.A., Inc.*, 834 F2d 1517 (9th Cir 1987). However, because citizens must give 60 days notice prior to bringing suit under the CWA, "in citizen enforcement actions the five-year statute of limitations period is tolled sixty days before the filing of the complaint, to accommodate the statutorily-mandated sixty-day notice period." *Id* at 1524. Thus, the window of time for CWA civil penalties claims covers only the five-years-plus-60-days period prior to that date, or back to March 8, 2003.

Outfall 3 pipe or its two associated discharge points.  Thus, the First Claim rests only on Outfalls 1 and 2 and groundwater as the alleged point sources of pollutant discharges into Grabhorn Pond.

The Second Claim is premised upon discharges from Grabhorn Pond itself (as a point source) into waters of the United States.  The record reveals three possible sources of discharge, namely:  (1) the pipe that was "decommissioned" in 2000; (2) the 18" pipe through which water from the unnamed creek flows into and fills Grabhorn Pond, into which an anti-backflow device was installed on February 25, 2008; and (3) alleged discharges from Grabhorn Pond through groundwater.

As discussed above, a single vandalism-induced discharge from Grabhorn Pond into the unnamed creek through the now-decommissioned pipe took place in 2000.  Plaintiffs have presented no evidence of any other discharges into the creek through that pipe and agree that after Grabhorn decommissioned that pipe by filling it with dirt, there have been no further discharges into the creek through that pipe.  Thus, any claim premised upon discharges through that decommissioned pipe is defective both as being outside the applicable five-years-plus-60-days statute of limitations, and as not being a source of ongoing violations at the time plaintiffs filed this case.

Similarly, on February 25, 2008, Grabhorn installed an anti-backflow device into the 18" pipe between Grabhorn Pond and the unnamed creek.  Plaintiffs agree that after the February 25, 2008 installation of the anti-backflow device in the other pipe, any backflow (theoretical or actual) from Grabhorn Pond into the unnamed creek through that pipe also ceased.  Thus, any claim premised upon discharges through that particular pipe is similarly defective as not being a source of "ongoing" violations when the Complaint was filed in May 2008.  Accordingly, the only theory

supporting the Second Claim over which this court may exercise jurisdiction is that Grabhorn

violated the CWA by means of discharges from Grabhorn Pond through groundwater with a direct

hydrological connection to navigable waters.

The remainder of this Opinion and Order addresses only the remaining alleged sources of

pollutant discharge, namely:  (1) the First Claim premised upon discharges into Grabhorn Pond

either through Outfalls 1 and 2 or through groundwater with a direct hydrological connection to

navigable waters; and (2) the Second Claim premised upon discharges from Grabhorn Pond

through groundwater with a direct hydrological connection to navigable waters.

### D.  <u>Whether Plaintiffs' Claims are Moot</u>

Grabhorn also contends that plaintiffs' First Claim is moot because it was the subject of

DEQ enforcement proceedings that culminated in entry of the MAO.  As discussed above, with

respect to the First Claim, the remaining alleged sources of pollutant discharge include only the

two drainage pipes (Outfalls 1 and 2) that discharged into the northern end of Grabhorn Pond and

the "rivulets" and/or "area of ponding" and/or pipe and discharge points that previously existed in

the area of Outfall 3.[10]  The MAO addresses discharges into Grabhorn Pond from Outfalls 1 and 2,

which until September 25, 2009, directed runoff into the northern end of Grabhorn Pond.[11]  In

accordance with its obligations under the MAO, Grabhorn has now paid a fine, completed the

---

[10]  *See* Malin Decl., ¶ 3; Complaint, ¶ 34 ("rivulets"); Amended Complaint, ¶ 48 ("rivulets"); Riskedahl Decl., Ex. U, p. 2 (Sixty Day Notice of Violations of the CWA asserting that landfill leachate was running directly into Grabhorn Pond via "channels and rivulets"); Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment on Affirmative Defenses and CWA Violations (docket #42), pp. 6, 17, and 19-20 ("area of ponding").

[11]  The MAO does not address the third alleged point source(s) identified by plaintiffs, namely the "rivulets" or the "area of ponding" located near the northwestern berm of Grabhorn Pond where the Outfall 3 pipe(s) were removed in February 2008.  As discussed above, this court concludes that the CWA covers pollutant discharges through hydrologically connected groundwater.  Because it does not address the alleged "rivulets" or "area of ponding," the MAO has no effect on plaintiffs' claims related to those alleged source(s) of discharges into Grabhorn Pond.  Because the MAO did not address any other alleged sources of pollutant discharges, it pertains only to the First Claim.

SEP, paid the associated SEP payment, and completed the Work Plan, rerouting discharges from

Outfalls 1 and 2 to a new, lined detention pond on September 25, 2009.

### 1.  Legal Standard

This court lacks jurisdiction to consider moot claims.  "It has long been settled that a

federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to

declare principles or rules of law which cannot affect the matter in issue in the case before it.'"

*Church of Scientology of California v. United States*, 506 US 9, 12 (1992), quoting *Mills v.*

*Green*, 159 US 651, 653 (1895) (remaining citations omitted).  "A case properly brought in the

first instance is rendered moot when 'interim relief or events have completely and irrevocably

eradicated the effects of the alleged violation.'"  *Chang v. United States*, 327 F3d 911, 918 (9th Cir

2003), quoting *County of Los Angeles v. Davis*, 440 US 625, 631 (1979).

To establish mootness, "a defendant must show that the court cannot order any effective

relief."  *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F3d 1153, 1159 (9th Cir 2002)

(citations omitted) ("*Tosco*").  Generally, when an administrative agency has performed the action

sought by plaintiffs in litigation, then the court "lacks the ability to grant effective relief," and the

claim is moot.  *Pub. Utility Comm'n v. FERC*, 100 F3d 1451, 1458 (9th Cir 1996).  Here, the issue

is whether Grabhorn's compliance with the terms of the MAO effectively precludes this court

from ordering any effective relief with respect to discharges through Outfalls 1 and 2.  This court

concludes that it does not.

### 2.  First Claim – Discharges at Outfalls 1 and 2

According to Grabhorn, all issues relating to the two discharge points of Outfalls 1 and 2

have been addressed by the DEQ's enforcement action, which culminated in issuance of the

MAO.  In particular, Grabhorn contends that any claim for declaratory or injunctive relief is moot because discharges from Outfalls 1 and 2 were rerouted to a new, lined detention pond on September 25, 2009.  Grabhorn also contends that any claim for civil penalties is moot because DEQ has already assessed and Grabhorn has already paid civil penalties related to those alleged discharges.

With regard to the CWA claims (including the First Claim), plaintiffs seek:  (1) a declaration that Grabhorn has violated and is violating 33 USC § 1311(a) by discharging pollutants without a permit; (2) an injunction enjoining Grabhorn from operating its facility or storing materials on site exposed to precipitation except in accordance with an NPDES permit and the CWA; (3) injunctive relief ordering Grabhorn to remediate the environmental damage and ongoing impacts resulting from its illegal discharges to Grabhorn Pond, the unnamed creek, and the Tualatin River; and (4) imposition of civil penalties.  Amended Complaint, p. 22.  As discussed below, Grabhorn's compliance with the MAO may well have mooted the second and third of these requests as they relate to discharges into Grabhorn Pond via Outfalls 1 and 2. However, Grabhorn's argument that its entry into and compliance with the MAO absolves it of all liability under the CWA and prevents this court from ordering any effective relief is at odds with the restrictive view of the role of mootness arguments in CWA citizen suits as expressed in *Laidlaw* and *Tosco*.

Among other forms of relief, plaintiffs seek a declaration that Grabhorn has violated and is violating 33 USC § 1311(a) by discharging pollutants without a permit.  By rerouting Outfalls 1 and 2, Grabhorn has mooted any request for a declaration that ongoing discharges through those point sources constitutes a violation of the CWA.  However, it does not resolve the issue of

whether any prior discharges through Outfalls 1 and 2 into Grabhorn Pond violated the CWA.

Nor does the MAO resolve that issue.  The MAO does not require Grabhorn to admit any

violation.  Instead, Grabhorn "neither admits nor denies the allegations" that formed the basis of

DEQ's enforcement action.  MAO, ¶ 4.  The MAO also does not require Grabhorn to apply for or

obtain an NPDES permit.  Instead, compliance with the MAO obviates "any need for [Grabhorn]

to have had or to obtain an NPDES permit for circumstances alleged in the Notice of Violation."

*Id*, ¶ 13.  Without a declaration one way or the other that Grabhorn's discharges into Grabhorn

Pond via Outfalls 1 and 2 violated (or did not violate) the CWA, plaintiffs' remaining requests for

relief cannot be resolved.  Thus, to the degree it requests declaratory relief that Grabhorn's

discharges through Outfalls 1 and 2 violated the CWA, plaintiffs' First Claim is not mooted by the

MAO.

Second, plaintiffs ask this court to enjoin Grabhorn from operating its facility or storing

materials on site exposed to precipitation except in accordance with an NPDES permit and the

CWA.  In the MAO, Grabhorn agreed to take certain steps in order to reduce the discharge of

pollutants from its site, including implementing the Work Plan.  *Id*, ¶ 13.  On September 25, 2009,

in accordance with its obligation to comply with the MAO and in accordance with the Work Plan,

Grabhorn rerouted discharges from Outfalls 1 and 2 to a new, lined detention pond.  That action

mooted any request for injunctive relief with respect to alleged discharges into Grabhorn Pond

through Outfalls 1 and 2.  There simply are no more discharges into Grabhorn Pond through

Outfalls 1 and 2 for this court to enjoin.

Third, plaintiffs seek injunctive relief ordering Grabhorn to remediate the environmental

damage and ongoing impacts resulting from its illegal discharges to Grabhorn Pond, the unnamed

creek, and the Tualatin River.  The MAO does contain provisions designed to reduce and then

eliminate discharges into Grabhorn Pond via Outfalls 1 and 2.  The MAO obligates Grabhorn to

complete the SEP.  *Id*, ¶ 18(c).  Additionally, Grabhorn agreed to implement and maintain Best

Management Practices and visually inspect and monitor stormwater discharge during the 2008-

2009 wet season, and to take "appropriate corrective action when an inspection or monitoring

demonstrat[ed] an exceedance of [certain] NPDES 1200-Z benchmarks."  *Id*, ¶¶ 14-16.  Grabhorn

also agreed to provide the results of its monitoring and inspections to DEQ and to describe any

corrective actions taken to address exceedances of the benchmarks.  *Id*, ¶ 17.

However, the MAO is woefully lacking in mandatory obligations or any significant

penalties for failing to meet these obligations.  In particular, the MAO imposed no penalties for

failure to take any such steps or provide any such notifications.  It also says nothing about

remediating the effects of past violations.  Given that those point sources have now been rerouted,

nothing supports the conclusion that pollutants are currently reaching Grabhorn Pond via Outfalls

1 and 2.  The record does not reveal what effects traceable to discharges through Outfalls 1 and 2

may still be in existence.  Suffice it to say that, to the degree plaintiffs can show any such effects,

they are not precluded from obtaining injunctive relief to address those effects on the basis of the

somewhat toothless terms of the MAO.

Finally, plaintiffs seek the imposition of civil penalties.  In the context of citizen suits,

post-filing cessation of violations "'ordinarily does not suffice to moot a case' because civil

penalties still serve as a deterrent to future violations."  *Tosco*, 309 F3d at 1159-60, quoting

*Friends of the Earth v. Laidlaw*, 528 US 167, 192 (2000).  Accordingly, "[p]ost-commencement

compliance may moot claims for injunctive relief, but district courts can still impose civil penalties for violations that have already taken place." *Id*.

Grabhorn paid a penalty of $1,120.00 when it returned the MAO to DEQ in late April or early May 2009 and paid the SEP Project payment of $4,480.00 some time before May 22, 2009. Grabhorn Decl. in Support of Defendant's Supplemental Brief to the Court (docket #92), ¶ 5.  The MAO does not specifically identify the time period it contemplates those payments will cover and expressly contemplates that discharges from the landfill will continue to take place during the 2008-2009 wet season.  MAO, ¶ 14.  Nevertheless, Grabhorn argues that the payments it made to DEQ pursuant to the MAO moot any claim for civil penalties related to discharges through Outfalls 1 and 2 in this citizen suit.  Accepting that argument would require this court to accept the proposition that the civil penalties assessed by DEQ and paid by Grabhorn covered both pre-payment discharges via Outfalls 1 and 2, as well as the ongoing violations that plaintiffs allege took place through the date that discharges through Outfalls 1 and 2 were rerouted.  However, "[l]iability for civil penalties attaches at the time of the violation." *Tosco*, 309 F3d at 1160. While this court is not unsympathetic to the notion that Grabhorn should get credit for the payments it has made in calculating any appropriate civil penalty pursuant to the CWA, it is unconvinced that those payments to the DEQ absolve it of all liability for civil penalties in this citizens' suit.  At this juncture, this court merely concludes that the record does not support the proposition that all claims for civil penalties for discharges into Grabhorn Pond via Outfalls 1 and 2 were mooted by the payments Grabhorn made pursuant to the MAO.  If and when appropriate, the parties will have an opportunity to state their positions as to exactly how much in CWA civil penalties is appropriate given Grabhorn's compliance with the terms of the MAO.

### E.  Conclusions – Preliminary Issues

This court concludes that the standing issue is now moot, that plaintiffs may premise

CWA violations on allegations of pollutant discharge to navigable waters via hydrologically

connected groundwater, but that certain claims are not well taken because they are not premised

upon ongoing violations at the time this case commenced.  Moreover, this court concludes that

neither the terms of the MAO, nor Grabhorn's actions subsequent to entering into the MAO, moot

all of the allegations of the First Claim.  Accordingly, for the reasons stated above, this court

concludes that what remains in this case are:  (1) with regard to the First Claim:  (a) potential civil

penalties or other relief for alleged discharges through Outfalls 1 and 2 (directly into Grabhorn

Pond) from March 8, 2003 (applicable statute of limitations date), until September 25, 2009 (the

date discharges from Outfalls 1 and 2 were rerouted to the new detention pond); and (b) potential

civil penalties or other relief for discharges via groundwater into Grabhorn Pond from Outfall 3

(area of ponding) insofar as those discharges are through groundwater with a direct hydrological

connection to navigable waters/waters of the United States; and (2) with regard to the Second

Claim: alleged discharges (from March 8, 2003 to the present) through groundwater with a direct

hydrological connection to navigable waters/waters of the United States.

## IV.  First Claim

Liability for any of the violations alleged in the First Claim for the discharge of pollutants

into Grabhorn Pond depends in part upon whether Grabhorn Pond fits within the CWA's

jurisdictional reach as "waters of the United States."  A careful review of the record and the case

law in this area reveals that plaintiffs have failed to meet their burden of establishing that

Grabhorn Pond meets this jurisdictional requirement either as an "interstate lake" under 33 CFR

§ 328.3(a)(3) or 40 CFR § 122.2(c) or as an "impoundment of waters otherwise defined as waters of the United States" under 33 CFR § 328.3(a)(4) or 40 CFR § 122.2(d). Therefore, plaintiffs' request for summary judgment as to liability on the First Claim is denied.[12]

## A. **Regulatory Framework**

Enacted in 1972 in an effort to restore and maintain the nation's waters, the CWA "prohibits the unpermitted discharge of pollutants into 'navigable waters.'" *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F3d 700, 704 (9th Cir 2007) ("*Cargill Salt*"), quoting 33 USC §§ 1331(a); *see also* 33 USC § 1362(12) (defining "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source"). The term "navigable waters" is, in turn, defined as "the waters of the United States, including the territorial seas." 33 USC § 1362(7). By not further defining the term "waters of the United States," Congress "implicitly delegated policy-making authority to the EPA and the [United States Army] Corps [of Engineers], the agencies charged with the CWA's administration." *Cargill Salt*, 481 F3d at 704 (citation omitted). The EPA and the Corps "initially construed the [CWA] to cover only waters navigable-in-fact [but] have since issued nearly identical regulations expanding the definition of 'waters of the United States' to include some intrastate waterbodies that are not navigable in the traditional sense." *Id* (footnote omitted).

Despite over three decades of CWA interpretation, the courts continue to wrangle over the proper interpretation of the term "waters of the United States." In its most recent opinion on the

---

[12] Plaintiffs did not seek summary judgment on the issue of whether Grabhorn Pond qualifies as a "wetlands adjacent to" waters identified as waters of the United States under 33 CFR § 328.3(a)(7) or 40 CFR § 122.2(g). Grabhorn denies that Grabhorn Pond is a wetland and has submitted testimony to support that conclusion. Malin Decl., ¶¶ 8-10 (as amended by this court's order on the motion to strike). Plaintiffs counter that Grabhorn Pond is listed on a wetlands inventory. Second Riskedahl Decl. (docket #59), Ex. W, p. 2. At this juncture, based on the paucity of evidence and briefing presented, this court declines to resolve that particular issue.

topic, the Supreme Court split on the jurisdictional reach of the CWA.  *Rapanos v. United States*, 547 US 715 (2006).  Since then, circuit courts across the country have struggled to interpret and apply *Rapanos*.  *See United States v. Bailey*, 571 F3d 791, 797-800 (8th Cir 2009) (discussing cases).

The EPA regulation defining the term "waters of the United States" lists seven regulatory categories, three of which are relevant here.[13]  Specifically, plaintiffs contend that Grabhorn Pond is "waters of the United States" either under subsection (c) as an "intrastate lake" or under subsections (d)-(e) as an "impoundment" of either an intrastate lake or a tributary.  Neither of these arguments withstands scrutiny.

### 1. Intrastate Lake

The definition of "waters of the United States" includes:

> All other waters such as intrastate lakes . . . the use degradation or destruction of which would affect or could affect interstate or foreign commerce including any such waters:  (1) Which are or could be used by interstate or foreign travelers for recreational or other purposes; (2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or (3) Which are used or could be used for industrial purpose by industries in interstate commerce."

40 CFR § 122.2(c).

In *Rapanos*, the plurality opinion found that the CWA's use of the term "navigable waters" conferred jurisdiction "only over relatively *permanent* bodies of water" and that "*only* wetlands with a continuous surface connection to bodies that are 'waters of the United States'" in their own

---

[13] Plaintiffs do not contend that Grabhorn Pond fits subsections (a) (waters susceptible to use in interstate or foreign commerce), (b) (interstate waters including interstate wetlands), or (f) (territorial seas) of 40 CFR § 122.2.  They have reserved the issue of whether it fits under subsection (g) (wetlands adjacent to waters identified as waters of the United States under the regulatory definition).

right . . . are 'adjacent to' such waters and covered by the [CWA]." *Rapanos*, 547 US at 734, 742

(emphasis in original).  Justice Kennedy filed an opinion concurring in the judgment, but took

issue with two limitations imposed by the plurality and concluded that "jurisdiction over wetlands

depends upon the existence of a significant nexus between the wetlands in question and navigable

waters in the traditional sense." *Rapanos*, 547 US at 779.  Elaborating on that conclusion, he

explained:

> Accordingly, wetlands possess the requisite nexus, and thus come
> within the statutory phrase "navigable waters," if the wetlands,
> either alone or in combination with similarly situated lands in the
> region, significantly affect the chemical, physical, and biological
> integrity of other covered waters more readily understood as
> "navigable."  When, in contrast, wetlands' effects on water quality
> are speculative or insubstantial, they fall outside the zone fairly
> encompassed by the statutory term "navigable waters."

*Id* at 780.

Plaintiffs argue that including "intrastate lakes" as "waters of the United States"

incorporates this "significant nexus" requirement by including only those intrastate lakes "the use

degradation or destruction of which could affect interstate or foreign commerce."  As a result,

they contend that the logical extension of *Rapanos* is that intrastate lakes with a "significant

nexus" to navigable waters constitute "waters of the United States."  Urging an expansive reading

of the Supreme Court jurisprudence on this issue, plaintiffs contend that in *Solid Waste Agency of

Northern Cook County v. U.S. Army Corps of Engineers*, 531 US 159 (2001) ("*SWANCC*"), a case

decided five years prior to *Rapanos*, the Supreme Court clarified that courts should presume that

the "use, degradation or destruction" of adjacent lakes could affect the "chemical, physical, and

biological integrity" of navigable waters and, therefore, intrastate lakes adjacent to navigable

waters are, as a matter of law, themselves "waters of the United States."  *SWANCC*, 531 US at

34 - OPINION AND ORDER

167.  In their view, Grabhorn Pond, separated from the unnamed creek and the Tualatin River

only by an earthen berm, falls within the CWA's jurisdictional reach.  This argument is rejected

for two reasons.

First, the focus of the "intrastate lake" definition is not on the location of the intrastate lake

(*i.e.* whether it is adjacent to and therefore has a "significant nexus") with respect to navigable

waters, but is instead on the effect the intrastate lake has or could have on interstate or foreign

commerce.  The term "waters of the United States" extends to wetlands which are "adjacent to

waters" which are otherwise defined as "waters of the United States," expressly allowing for

jurisdiction on an "adjacency" basis.  40 CFR § 122.2(g).  In contrast, the "intrastate lake" portion

of the definition of "waters of the United States" does not allow for jurisdiction on the basis of

adjacency.  Instead, that definition focuses on the effect of the intrastate lake on interstate

commerce, including those waters:  "(1) which are or could be used by interstate or foreign

travelers for recreational or other purposes; (2) from which fish or shellfish are or could be taken

and sold in interstate or foreign commerce; or (3) which are or could be used for industrial

purposes by industries in interstate commerce."  40 CFR § 122.2(c).  Plaintiffs have presented no

evidence that Grabhorn Pond is used for recreational purposes by interstate travelers, is the source

of fish or shellfish sold in interstate commerce, or is used for industrial purposes by industries in

interstate commerce.  Instead, the evidence is to the contrary.  Grabhorn Decl., ¶ 4.

Second, *SWANCC* never went this far, and nothing in subsequent case law would allow

such an expansive interpretation of the "waters of the United States" requirement.  In *SWANCC*,

the Court acknowledged that its previous jurisprudence "noted that the term 'navigable' is of

'limited import' and that Congress evidenced its intent to 'regulate at least some waters that

would not be deemed 'navigable' under the classical understanding of that term.'" *SWANCC*, 531 US at 167. However, the Court made explicit that its "holding [in *United States v. Riverside Bayview Homes, Inc.*, 474 US 121, 134 (1985)] was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters." *Id*. Specifically, "Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands 'inseparably bound up with the "waters" of the United States.'" *Id*, quoting *Riverside Bayview Homes*, 474 US at 134.

At its core, plaintiffs' argument that Grabhorn Pond constitutes "waters of the United States" as an intrastate lake turns on their contention that its location, within a few hundred feet of the navigable waters of the unnamed creek and the Tualatin River, is sufficient to confer CWA jurisdiction. The Ninth Circuit has expressly rejected the notion that an "adjacency" argument applies to confer CWA jurisdiction outside the context of wetlands. *Cargill Salt*, 481 F3d at 702 ("mere adjacency provides a basis for CWA coverage only when the relevant waterbody is a 'wetland'"). Nothing in the holdings of *Riverside Bayview Homes*, *SWANCC*, and *Rapanos*, can be read to undermine that conclusion.

Accordingly, for the reasons discussed above, this court concludes that plaintiffs have failed to show that CWA jurisdiction exists on the basis that Grabhorn Pond constitutes "waters of the United States" as an "intrastate lake" under 33 CFR § 328.3(a)(3) and 40 CFR § 122.2(c).

### 2. **Impoundment**

Plaintiffs also argue that Grabhorn Pond is "waters of the United States" because it is an "impoundment" of either an intrastate lake or a tributary under subsection 40 CFR § 122.2(c)-(e).

It is undisputed that, in February 2008, an anti-backflow device known as a "gator flap" was installed in the pipe between Grabhorn Pond and the unnamed creek. According to plaintiffs, the installation of this device effectively "impounded" Grabhorn Pond which previously was either an "interstate lake" (40 CFR § 122.2(c)) or a "tributary" (40 CFR § 122.2(e)) of either the unnamed creek or the Tualatin River, which are themselves "waters of the United States." As discussed above, this court concludes that Grabhorn Pond does not constitute "waters of the United States" as an "intrastate lake" under 40 CFR § 122.2(c). Thus, plaintiffs' argument that Grabhorn Pond is an "impoundment" hinges on whether Grabhorn Pond was a "tributary" of the unnamed creek (and ultimately the Tualatin River) prior to installation of the anti-backflow device.

"A stream which contributes its flow to a larger stream or other body of water is a tributary." *Cmty. Ass'n for Restoration of the Environment v. Henry Bosma Dairy*, 305 F3d 943, 954 (9th Cir 2002), citing *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F3d 526, 533 (9th Cir 2001). "[W]hen the question is whether a water is properly classified as a 'tributary' subject to Corps jurisdiction, that water must exchange water, at least intermittently, with a water of the United States." *Baccarat Freemont Developers, LLC v. US Army Corps of Engineers*, 425 F3d 1150, 1156 (9th Cir 2005) (interpreting *Headwaters, Inc.*). Thus, in order to establish that, prior to the installation of the anti-backflow device, Grabhorn Pond was a "tributary" of the unnamed creek, plaintiffs must establish that Grabhorn Pond "at least intermittently" exchanged water with the unnamed creek.

The hurdle plaintiffs face in this regard is that the record lacks evidence of backflow from Grabhorn Pond into the unnamed creek, much less the intermittent level of backflow that would permit a finding that Grabhorn Pond is a tributary of the creek. The only evidence in the record

regarding backflow from Grabhorn Pond into the unnamed creek through the decommissioned

pipe is that, in 2000, vandals opened a valve and discharged some water from Grabhorn Pond into

the creek.  Shortly thereafter, Grabhorn closed off the pipe by filling it with dirt.  There is no

evidence of any discharges through that pipe into the creek prior to 2000, nor is there evidence

that the pipe has since been breached.  This evidence is a far cry from evidence of an "intermittent

hydrologic connection" which may form the basis of a finding that a channel is a "tributary" for

CWA purposes.  In short, evidence of a one-time discharge of water from Grabhorn Pond into the

unnamed creek is, as a matter of law, insufficient to establish that Grabhorn Pond was a

"tributary" for purposes of the CWA.

      This leaves the surface water connection between Grabhorn Pond and the unnamed creek

allegedly established through the 18" pipe on the northeastern edge of Grabhorn Pond.  On this

issue, the evidence is equally unavailing.  Howard Grabhorn states in his declaration that to his

knowledge "the physical arrangements and conditions are not such that water in the irrigation

pond could flow through the pipe back into the unnamed creek" and that in "decades of being on

the property almost daily, [he has] never seen such a phenomenon."  Grabhorn Decl., ¶ 9.

Nevertheless, plaintiffs contend that, prior to installation of the anti-backflow device, water could

and did flow back into the unnamed creek through the 18" pipe.  However, they have presented no

evidence that water actually did backflow into the unnamed creek or, if so, how often.

      The record reveals evidence that Mr. Grabhorn described the 18" pipe as a "two-way pipe"

to the DEQ inspectors that visited the Grabhorn property in January 2008.[14]  Exhibit I, p. 1.  Mr.

---

[14]  The statement that the pipe was a "two-way pipe" is not probative that any flow from Grabhorn Pond into the creek took place.  At best, it describes a physical characteristic of the pipe, namely that at that time it had no valve or other anti-backflow device installed.

Grabhorn also acknowledged that "theoretically, if the water level in the creek dropped sufficiently, and the water level in the ponds remained high, then there is a possible risk of back flow to the creek from the irrigation water in the ponds," but emphasized that the pipe was designed to allow water to flow only into Grabhorn Pond (not backflow into the creek) and that he was not aware that water had ever backflowed into the unnamed creek from Grabhorn Pond:

> This 18" pipe is constructed for water to flow only one way – and that is into, not out of, the ponds. There is no intention that this pipe facilitates the return of water from the ponds to the creek. Rather this pipe is designed and used as a one-way device to provide irrigation water for the irrigation ponds. This is entirely in accord with the purpose of the ponds and the diversion structure. Specifically, the point of the diversion is for use of a water right for withdrawal of irrigation water, which is subsequently pumped to the tree farm property. . . . This system is not intended to discharge into the creek, and I am not aware that it has ever done so. Accordingly, we do not understand this pipe to cause or facilitate a discharge other than of creek water into the irrigation ponds.

Exhibit H, p. 1 (emphasis in original).

Apart from this evidence,[15] plaintiffs rely on two snippets of testimony by Mr. Grabhorn which they contend indicate that backflow into the creek must have taken place. He stated that the "pond water [would never be] higher than the creek level" because "water seeks its own level" (Grabhorn Depo., p. 34 (Exhibit F, p. 6)) and "tested" the anti-backflow device when they installed it, and "[i]t worked" and thought it was a "good idea. You get more water out of it" (Grabhorn Depo., p. 45 (Exhibit F, p. 9)). Neither of these statements is inconsistent with Mr. Grabhorn's assertion in his February 13, 2008 letter that he was not aware that waters in Grabhorn Pond had ever backflowed back into the unnamed creek. At most, these statements simply

---

[15] Plaintiffs also cite a statement in a report prepared in a December 2007 report prepared by Grabhorn's consultants (Exhibit J, p. 3), but that statement was later retracted as incorrect (Exhibit P. p. 1).

support Mr. Grabhorn's acknowledgment that "theoretically" backflow could happen if the water

in Grabhorn Pond got sufficiently high and the water level in the creek became sufficiently low,

and his understanding of how the anti-backflow device was designed to work.

This evidence is insufficient as a matter of law to establish a backflow of water from

Grabhorn Pond back into the unnamed creek.  Accordingly, it is insufficient to establish the

"intermittent hydrologic connection" that is the touchstone of the tributary inquiry.  Without

evidence of intermittent backflow from Grabhorn Pond into the creek, installation of the anti-

backflow device does not assist plaintiffs.  They have failed to meet their burden of presenting

evidence from which it may be concluded that Grabhorn Pond is a "tributary" of the unnamed

creek for purposes of CWA jurisdiction.  Accordingly, Grabhorn Pond is not "waters of the

United States" on the basis that it was a "tributary" of the unnamed creek that was impounded by

installation of the anti-backflow device.

///

///

///

///

///

///

///

///

///

///

## ORDER

Plaintiffs' Motion for Summary Judgment on Affirmative Defenses and Clean Water Act Violations (docket #34) is:

DENIED as MOOT with respect to the standing issue;

DENIED with respect to the First Claim as to whether Grabhorn Pond is "waters of the United States" as either an "intrastate lake" or "impoundment," and

GRANTED IN PART AND DENIED IN PART as against the First Affirmative Defense in Defendant's Answer to Plaintiffs' Amended Complaint (Mootness - CWA).

Defendant's Cross-Motion for Summary Judgment (docket #49) is:

GRANTED IN PART AND DENIED IN PART as against the First Affirmative Defense in Defendant's Answer to Plaintiffs' Amended Complaint (Mootness - CWA);

With respect to the First Claim, GRANTED insofar as Grabhorn Pond is not a "waters of the United States" as either an "intrastate lake" or "impoundment" of a tributary or intrastate lake; and DEFERRED as to whether Grabhorn Pond is a "wetland adjacent" to other waters of the United States; and

With respect to the Second Claim, GRANTED with respect to surface water point discharges to "waters of the United States" that would require a NPDES permit under the CWA; and DENIED with respect to pollution through groundwater with a direct hydrological connection to navigable waters.

///

///

///

41 - OPINION AND ORDER

Accordingly, the following issues remain before this court:

First Claim (for discharges into Grabhorn Pond), assuming that Grabhorn Pond is waters of the United States as a "wetland adjacent" to other waters of the United States:

(1) claims for civil penalties and declaratory and injunctive relief for discharges between March 8, 2003 and September 25, 2009, into Grabhorn Pond through the pipes of Outfalls 1 and 2; and

(2) claims premised upon discharges after March 8, 2003, into Grabhorn Pond through "rivulets" and/or an "area of ponding" with a direct hydrological connection to Grabhorn Pond.

Second Claim (alleging that Grabhorn Pond itself as a "point source") premised upon alleged discharges after March 8, 2003, through groundwater with a direct hydrological connection to the unnamed creek or the Tualatin River.

DATED this 30th day of October, 2009.

__/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge